FIREMAN'S FUND INSURANCE COMPANY OF WISCONSIN,
Plaintiff-Appellant,

v.

BRADLEY CORPORATION and Kevin B. Kline,
Defendants-Respondents-Petitioners,

LAWLER MANUFACTURING CORPORATION, INC.,
Defendant.

Supreme Court

*No. 01–2432. Oral argument February 11, 2003.—Decided
May 6, 2003.*

2003 WI 33

(Also reported in 660 N.W.2d 666.)

For the defendants-respondents-petitioners there were briefs by *Thomas L. Shriner, Jr., Lisa S. Neubauer, G. Michael Halfenger,* and *Foley & Lardner,* Milwaukee, and oral argument by *Thomas L. Shriner, Jr.*

For the plaintiff-appellant there was a brief by *William P. Croke, Todd M. Rowe, and Quale, Feldbrue-*

*gge, Calvelli, Thom & Croke, S.C.* Milwaukee, and oral argument by *William P. Croke.*

An amicus curiae brief was filed by *Heidi L. Vogt* and *Cooke & Franke S.C.,* Milwaukee, on behalf of the Wisconsin Insurance Alliance.

¶ 1. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE. This is a review of a published opinion of the court of appeals, *Fireman's Fund Insurance Co. v. Bradley Corp.,* 2002 WI App 179, 256 Wis. 2d 643, 649 N.W.2d 685. The circuit court for Milwaukee County, Thomas R. Cooper, Judge, granted summary judgment in favor of the defendants, Bradley Corporation (Bradley), and its employee, Kevin B. Kline, against Fireman's Fund Insurance Co. (Insurance Company). The court of appeals reversed the judgment of the circuit court.

¶ 2. The Insurance Company initiated a declaratory judgment action against the defendants seeking a determination of whether the Insurance Company had a duty under its Comprehensive General Liability (CGL) insurance policies to defend Bradley in a lawsuit brought by Lawler Manufacturing Corporation (Lawler).[1]

¶ 3. The circuit court denied the Insurance Company's motion for summary judgment and granted summary judgment to the defendants instead. The circuit court held that the Insurance Company had a duty to defend Bradley in the underlying Lawler lawsuit because count II of the Lawler complaint, alleging "trade secret misappropriation," constituted an "advertising injury" covered by the CGL insurance policies. In addition, the circuit court held that although the notice

---

[1] Lawler was originally included as a defendant in this action as well but was later dismissed.

12

provided by Bradley was untimely, the Insurance Company was not prejudiced by the delay and therefore the lack of timely notice did not result in the loss of coverage.[2]

¶ 4. The court of appeals reversed the judgment of the circuit court. The court of appeals held that neither count II (alleging "trade secret misappropriation") nor count VII (alleging "federal unfair competition") of Lawler's complaint triggered the Insurance Company's duty to defend.

¶ 5. The issue presented is whether the Insurance Company had a duty to defend Bradley under the advertising injury provisions of its CGL insurance policies. We conclude that it had such a duty and therefore reverse the decision of the court of appeals.

¶ 6. We hold that the allegations in count VII of the Lawler complaint, alleging unfair competition in violation of the federal Lanham Act, give rise to the possibility of coverage. Count VII of the Lawler complaint arguably makes a claim for trade dress infringement that falls within the advertising injury's "infringement of trademark" provision.[3] The complaint also

---

[2] The circuit court then entered judgment in favor of the defendants dismissing the insurance company's suit and awarding Bradley a total of $2,887,594.24 for defense and indemnification costs in the underlying suit, as well as costs and disbursements in the present action.

[3] Bradley's CGL insurance policies, unlike many CGL policies, specifically define advertising injury to include "infringement of trademark." Under the standard form CGL policy, insureds frequently seek coverage for trademark or trade dress infringement and trade secret theft by arguing that these offenses constitute either the offense of "misappropriation of advertising ideas or style of doing business" or the offense of "infringement of copyright, title or slogan." Indeed, in the

alleges an injury—consumer confusion—that is arguably caused by Bradley's advertising of products that include Lawler's misappropriated designs.[4]

¶ 7. Furthermore, we hold that although Bradley did not provide timely notice to the Insurance Company

present case, Bradley asserts that count VII in the Lawler complaint also triggers a duty to defend under the "misappropriation of advertising ideas or style of doing business" provision in its CGL policies.

Courts that have faced such claims have struggled to delineate the proper scope of coverage that advertising injury provisions guarantee, and courts remain divided over the conditions necessary to give rise to coverage in intellectual property cases. *Compare Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.,* 99 F.3d 795 (6th Cir. 1996), *with Lebas Fashion Imports v. ITT Hartford Ins. Group,* 59 Cal. Rptr. 2d 36 (Ct. App. 1996). *See generally* Christopher L. Graff, *Insurance Coverage of Trademark Infringement Claims: The Contradiction Among the Courts, and the Ramifications for Trademark Attorneys,* 89 Trademark Rep. 939 (1999); D. Peter Harvey, *Insurance for Intellectual Property Claims: The Growing Coverage Debate,* Intell. Prop. L. Bull., Fall 2001, at 1.

Because we agree with Bradley that the allegations set forth in count VII of Lawler's complaint trigger the Insurance Company's duty to defend under the "infringement of trademark" provision of its CGL policies, we need not address the scope or meaning of "misappropriation of advertising idea or style of doing business" to determine whether these provisions include trademark or trade dress infringement claims.

[4] Because we conclude, based on count VII, that a duty to defend exists under the "infringement of trademark" provision, we need not address Bradley's arguments that counts II, VII, and VIII are also covered under the "misappropriation of advertising ideas or style of doing business" provision of the policies or that any other injuries were caused by Bradley's advertising.

of the Lawler lawsuit, Bradley carried the burden of persuasion that the late notice did not prejudice the Insurance Company.

¶ 8. Accordingly, we hold, as a matter of law, that the Insurance Company had a duty to defend Bradley in the Lawler lawsuit and therefore reverse the decision of the court of appeals. We remand the award of attorney fees to the circuit court for additional evidence and the determination of reasonable attorney fees.

I

¶ 9. The court of appeals cogently summarized the facts of this case, and we substantially adopt its statement of the facts here.

¶ 10. The Insurance Company issued four Comprehensive General Liability (CGL) insurance policies to Bradley effective from February 1, 1996 to February 1, 2000. The insurance policies provided that the Insurance Company would pay those sums that Bradley became obligated to pay as damages because of bodily injury, property damage, personal injury, or advertising injury. The insurance policies define each of these terms.

¶ 11. On December 3, 1998, Lawler filed a lawsuit against the defendants in the United States District Court for the Southern District of Indiana. The original complaint set forth eight counts, including breach of fiduciary duty, trade secret misappropriation, unjust enrichment, diversion of corporate opportunities, conversion, negligence, federal unfair competition, and common law unfair competition. Lawler's supplemental complaint further asserted a claim for patent infringement.

¶ 12. Bradley and Lawler are competitors in the development and sale of thermostatic mixing systems

intended for emergency applications. The lawsuit resulted from alleged corporate/industrial espionage by a former Lawler employee, Kevin Kline.[5] Lawler designed and patented thermostatic mixing valves capable of regulating the inflow of hot and cold water into emergency showers and eyewash systems so as to consistently and immediately produce tempered water.[6] The complaint alleges that Kline stole Lawler's "ideas, concepts, and designs" for its thermostatic mixing valves, and that Bradley then hired Kline and used the stolen information to create its own thermostatic mixing valves for emergency showers and eyewash systems.

¶ 13. Bradley did not notify the Insurance Company of the Lawler lawsuit until March 2, 2000, nearly 15 months after the initial complaint and just two weeks before a hearing on a preliminary injunction had been scheduled. At that time, the Insurance Company denied coverage for the lawsuit.

¶ 14. On August 18, 2000, the Insurance Company sought a declaratory judgment in Milwaukee County circuit court that it had no obligation under its insurance policies to defend or indemnify Bradley in the Lawler lawsuit. On July 25, 2001, the circuit court denied the Insurance Company's motion for summary judgment and granted summary judgment to the defen-

---

[5] Kevin Kline was a shareholder, officer, and director of Lawler, a closely held corporation with never more than three shareholders. He was also its senior valve engineer, either inventing or co-inventing much of the technology used in Lawler's thermostatic mixing valves.

[6] The valves are apparently essential in emergency shower and eyewash systems to ensure that the systems deliver water at a safe temperature whenever needed in a chemical or industrial emergency.

dants. The circuit court ordered the Insurance Company to pay Bradley $2,887,594.24 for defense and indemnification costs.

## II

¶ 15. We review a circuit court order granting summary judgment applying the same methodology as that used by the circuit court.[7] Summary judgment will be entered when a court is satisfied that the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[8]

¶ 16. This declaratory judgment action also involves the interpretation of insurance policies. The court has set forth, in numerous cases, overlapping rules for interpreting an insurance policy. The rules of interpretation applicable in the present case are as follows: Words and phrases in insurance contracts are subject to the same rules of construction that apply to contracts generally;[9] the primary objective in interpreting and construing a contract is to ascertain and carry out the true intent of the parties.[10]

---

[7] *Grams v. Boss,* 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980).

[8] Wis. Stat. § 802.08(2) (1999–2000).

[9] *Peace v. Northwestern Nat'l Ins. Co.,* 228 Wis. 2d 106, 120, 596 N.W.2d 429 (1999); *Kremers-Urban Co. v. Am. Employers Ins.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984).

[10] *Mau v. N.D. Ins. Reserve Fund,* 2001 WI 134, ¶ 13, 248 Wis. 2d 1031, 637 N.W.2d 45; *Peace,* 228 Wis. 2d at 120; *Kremers-Urban Co.,* 119 Wis. 2d at 735.

¶ 17. When no extrinsic evidence is introduced, the interpretation of an insurance policy is a question of law that we determine independently of the circuit court or court of appeals but benefiting from their analyses.[11] No extrinsic evidence was introduced in the present case.

### III

¶ 18. The relevant legal analysis for determining when an insurer has a duty to defend an insured is well established in Wisconsin.

¶ 19. An insurer's duty to defend an insured is determined by comparing the allegations of the complaint to the terms of the insurance policy.[12] "An insurer's duty to defend the insured in a third-party suit is predicated on allegations in a complaint which, if proven, would give rise to the possibility of recovery that falls under the terms and conditions of the insurance policy."[13] The duty to defend is based solely on the allegations "contained within the four corners of the complaint," without resort to extrinsic facts or evidence.[14]

---

[11] *Smith v. Katz,* 226 Wis. 2d 798, 805, 595 N.W.2d 345 (1999); *Katze v. Randolph & Scott Mut. Fire Ins. Co.,* 116 Wis. 2d 206, 212, 341 N.W.2d 689 (1984); *RTE Corp. v. Maryland Cas. Co.,* 74 Wis. 2d 614, 620, 247 N.W.2d 171 (1976).

[12] *Smith,* 226 Wis. 2d at 806 (citing *School Dist. of Shorewood v. Wausau Ins. Co.,* 170 Wis. 2d 347, 364–65, 488 N.W.2d 82 (1992)).

[13] *Shorewood,* 170 Wis. 2d at 364.

[14] *Atl. Mut. Ins. Co. v. Badger Med. Supply Co.,* 191 Wis. 2d 229, 236, 528 N.W.2d 486 (Ct. App. 1995).

¶ 20. When comparing the allegations of a complaint to the terms of an insurance policy, the allegations in the complaint are construed liberally.[15] The duty to defend is necessarily broader than the duty to indemnify because the duty to defend is triggered by arguable, as opposed to actual, coverage.[16] We therefore "assume all reasonable inferences"[17] in the allegations of a complaint and resolve any doubt regarding the duty to defend in favor of the insured.[18]

¶ 21. In addition, a duty to defend is based upon the nature of the claim and not on the merits of the claim. "It is the nature of the claim alleged against the insured which is controlling even though the suit may be groundless, false or fraudulent."[19] Consequently, "an insurer may have a clear duty to defend a claim that is utterly specious because, if it were meritorious, it would be covered."[20] Finally, when an insurance policy pro-

---

[15] *Doyle v. Engelke,* 219 Wis. 2d 277, 284, 580 N.W.2d 245, (1998).

[16] *General Cas. Co. of Wis. v. Hills,* 209 Wis. 2d 167, 176 n.11, 561 N.W.2d 718 (1997); *Bruner v. Heritage Cos.,* 225 Wis. 2d 728, 735, 593 N.W.2d 814 (Ct. App. 1999).

[17] *Doyle v. Engelke,* 219 Wis. 2d 277, 284, 580 N.W.2d 245, 248 (1998).

[18] *Wausau Tile, Inc. v. County Concrete Corp.,* 226 Wis. 2d 235, 266, 593 N.W.2d 445 (1999); *Shorewood,* 170 Wis. 2d at 364.

[19] *Grieb v. Citizens Cas. Co.,* 33 Wis. 2d 552, 558, 148 N.W.2d 103 (1967).

[20] *Smith,* 226 Wis. 2d at 807.

vides coverage for even one claim made in a lawsuit, the insurer is obligated to defend the entire suit.[21]

## IV

¶ 22. To determine the Insurance Company's duty to defend we first examine the advertising injury provision of the CGL insurance policies and then turn to the allegations in the Lawler complaint, focusing especially on count VII.

¶ 23. The CGL insurance policies in the present case provide that the Insurance Company will have the right and duty to defend Bradley against any suit alleging advertising injury. Advertising injury provisions have been part of the standard form CGL insurance policy for many years, and a growing body of case law has developed around claims that advertising injury provisions provide coverage for intellectual property lawsuits, including trademark and trade dress, patent, copyright, and trade secret cases.[22]

¶ 24. Part B of the CGL insurance policies relating to "Personal and Advertising Injury Liability" provides coverage for an "advertising injury" caused by an offense committed in the course of advertising the insured's goods, products, or services. The insurance policies specifically define "advertising injury" as an injury "arising out of one or more of" four distinct offenses, including "infringement of trademark."

¶ 25. The CGL insurance policies read, in relevant part, as follows:

---

[21] *Doyle,* 219 Wis. 2d at 285 n.4; *Shorewood,* 170 Wis. 2d at 366.

[22] *See, e.g.,* Graff, *supra* note 3; Harvey, *supra* note 3.

We will pay those sums that the insured becomes legally obligated to pay as damages because of **personal injury** or **advertising injury . . . .**

. . . .

. . . This insurance applies to:

. . . .

. . . **Advertising injury** caused by an offense committed in the course of advertising your goods, products or services.

. . . .

**Advertising injury** means injury arising out of one or more of the following offenses:

a. Oral, written, televised or videotaped publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral, written, televised or videotaped publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of trademark, copyright, title or slogan.[23]

---

[23] The insurance policies providing coverage from February 1, 1996, through February 1, 1998, did not include coverage for trademark infringement. Subsection (d) above originally covered only "infringement of copyright, title or slogan." Trademark infringement was added by a broadened form endorsement to the policies executed with the 1998–99 and 1999–2000 policies. Neither party disputes that the broadened definition, including trademark infringement, applies in the present case.

¶ 26. We now turn to the allegations in the Lawler complaint to determine whether they give rise to the possibility of coverage under the CGL insurance policies' advertising injury provision (subsection (d)) relating to infringement of trademark. In order to make this determination we must answer three questions: (a) Does the Lawler complaint state an offense covered under the advertising injury provisions of the insurance policies? (b) Does the Lawler complaint allege that Bradley engaged in advertising activity? (c) Does the Lawler complaint allege a causal connection between the injury alleged and Bradley's advertising activity?[24]

## A

¶ 27. The touchstone for determining whether the Lawler complaint has alleged an advertising injury is the enumerated offenses in the insurance policy. Only those risks are insured, no others.[25]

¶ 28. Both parties agree that under the CGL insurance policies in the present case, an advertising injury arising from the offense of "infringement of trademark" denotes the entire field of trademarks,

For general discussions of insurance policies covering "advertising injury," see, *e.g.*, 9 Lee R. Russ & Thomas S. Segalla, *Couch on Insurance* §§ 129:25–28 (3d ed. 1999 & Supp. 2002); Graff, *supra* note 3; Harvey, *supra* note 3; Elizabeth D. Lauzon, *Advertising Injury Insurance*, 98 A.L.R. 5th 1 (2002); Byron L. Romine, *Advertising Injury Coverage Analysis for Trademark and Trade Infringement Claims In Texas: As Easy As One, Two, Three*, 6 Tex. Wesleyan L. Rev. 211 (2000).

[24] *See* Graff, *supra* note 3; Harvey, *supra* note 3; Romine, *supra* note 23.

[25] *Heritage Mut. Ins. Co. v. Advanced Polymer Tech.*, 97 F. Supp. 2d 913, 921 (S.D. Ind. 2000).

service marks, trade names, and trade dress.[26] An alleged trade dress infringement is the trademark infringement involved in the present case. Trade dress is defined as a product's "total image"[27] and "refers to the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques."[28] Moreover, it includes not only the packaging or "dressing" of a product but can also encompass the "*design* of a product."[29] The purpose of both trade dress and trademark is to enable a business to identify itself as the source of a given product through the adoption of some distinctive mark.[30]

---

[26] *See Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 n.1 (7th Cir. 1998) ("The term 'trademark' can be used in a broad and generic sense to denote the entire field of trademarks, service marks, trade names, and trade dress.").

Jon Wittig, the litigation manager for the Insurance Company, conceded in his deposition that a claim for "trade dress infringement" that otherwise met all of the requirements for coverage would be included under the "infringement of trademark" provision in its CGL policies. The Insurance Company does not dispute that concession in the present case.

[27] *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983).

[28] *Syndicate Sales Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (citations omitted).

[29] *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000) (emphasis added) (citing *Ashley Furniture Indus., Inc. v. Sangiacomo N.A., Ltd.*, 187 F.3d 363 (4th Cir. 1999); *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996 (2d Cir. 1995); *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780 (8th Cir. 1995)).

[30] *Wal-Mart*, 529 U.S. at 210; *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935–36 (7th Cir. 1989).

¶ 29. The Lawler complaint alleges that the defendants committed nine separate offenses. Our inquiry focuses on count VII titled "Federal Unfair Competition," alleging that Bradley violated § 43 of the federal Lanham Act (15 U.S.C. § 1125).[31] A party may obtain relief under this statutory provision for trade dress infringement.[32]

¶ 30. Section 43 of the Lanham Act was designed to create a new federal remedy for the particular kind of unfair competition that results from false designation of origin or other false representation used in connection with the sale of a product.[33] The key to finding a

---

[31] 15 U.S.C. § 1125 reads, in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

[32] *Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145, 1151 (7th Cir. 1994).

[33] *Metric & Multistandard Components Corp. v. Metric's, Inc.,* 635 F.2d 710, 713 (8th Cir. 1980) (citations omitted).

Section 43 of the Lanham Act gives a producer "a cause of action for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof . . . which . . . is

violation under § 43 "is a determination that the materials used by the defendant created a likelihood of confusion, deception or mistake on the part of the consuming public."[34]

¶ 31. Count VII specifically alleges a violation of § 43 of the Lanham Act (15 U.S.C. § 1125) based on Bradley's misappropriation of Lawler's "Trade Secrets, technologies and designs relating to thermostatic mixing valves" and the use of those designs to create a "false designation of origin." Count VII of the complaint reads:

> 115. Bradley's misappropriation of Lawler's Trade Secrets, technologies and designs relating to thermostatic mixing valves and the use thereof in connection with the accused products is a false designation of origin, or a false description or representation, and wrongfully and falsely designates the origin of Lawler's thermostatic mixing valve technology as originating from or being connected with Bradley, and amounts to using a false description or representation in commerce.
>
> 116. Bradley's said acts are in violation of the federal Lanham Act (15 U.S.C. § 1125).

¶ 32. We conclude that the allegations in Lawler's complaint arguably fit within trade dress infringement. Paragraph 115 of Lawler's complaint accuses Bradley of misappropriating mixing valve "designs." The complaint expressly distinguishes the misappropriated de-

likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . .' " *Wal-Mart,* 529 U.S. at 209 (2000) (quoting 15 U.S.C. § 1125(a)).

[34] *Metric,* 635 F.2d at 713 (citations omitted). See also *Environ Prods., Inc. v. Furon Co., Inc.,* 1998 WL 398074, *4 (E.D. Pa. June 26, 1998).

signs from stolen trade secrets and technologies by alleging misappropriation of three separate items: "Trade Secrets, technologies *and* designs." It is a reasonable inference, therefore, to conclude that the word "designs" refers to something apart from both trade secrets and misappropriated technologies and possibly reaches distinguishing, non-functional *items* in the mixing valve system.[35]

¶ 33. Furthermore, the allegations in paragraph 115 of Lawler's complaint specifically refer to the Lanham Act's language regarding consumer confusion, deception, and mistake. Lawler alleges that Bradley's use of its protected designs has led to "a false designation of origin" and a "false description or representation," and "falsely designates the origin of Lawler's thermostatic mixing valve technology as originating from or being connected with Bradley [which] amounts to using a false description or representation in commerce."

¶ 34. Thus, when paragraphs 115 and 116 are read together, count VII of Lawler's complaint is reasonably construed to allege the infringement of trademark under the CGL insurance policies; the nature of the claim in count VII of Lawler's complaint is that Bradley committed trade dress infringement in violation of § 43 of the Lanham Act.

¶ 35. The Insurance Company contends that Bradley's argument must fail because Lawler's com-

---

[35] *See, e.g., Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145 (7th Cir. 1994). In *Badger Meter,* Badger alleged that one of its competitors copied the design of its water meter. The copied design included many functional elements not subject to trade dress protection but also included a single ornamental aspect—a distinguishing "Badger blue" plastic collar. The court held that trade dress protection extended to a plastic collar in a water meter with this design if it was "Badger blue."

26

plaint does not use the words "trademark" or "trade dress" and that neither the complaint nor Bradley ever identifies a single distinguishing, non-functional feature of the mixing valve system that could possibly be the subject of a trade dress claim.

¶ 36. We disagree with the Insurance Company. It is not dispositive that the specific words "trademark" and "trade dress" are not included in the complaint or that neither the complaint nor Bradley identifies a single distinguishable, non-functional feature of the mixing valve system that could be the subject of a trade dress claim.[36] Allegations in a complaint are to be liberally construed when ascertaining whether a duty to defend exists and a reviewing court is obliged to make reasonable inferences based on the complaint's language.[37] Moreover, in analyzing a duty to defend, the merits of the claim are irrelevant; it is the nature of the claim that controls our inquiry.[38]

¶ 37. The Insurance Company further argues that the complaint, when viewed in its entirety, clearly alleges the theft of only patented, functional designs. According to the Insurance Company, any focus on the word "designs" in count VII must be viewed in the context of the entire complaint, which has, as its "aim," redress for stolen patented technology, and thus it is not reasonable to infer that any of the designs were distinctive or non-functional.

---

[36] *Allison v. Ticor Title Ins. Co.,* 907 F.2d 645, 649 (7th Cir. 1990) ("In a system of notice pleading, an insurer may be called on to defend without a complete articulation of the claim against its policyholders.").

[37] *Doyle,* 219 Wis. 2d at 284.

[38] *Smith,* 226 Wis. 2d at 807; *Grieb,* 33 Wis. 2d at 558.

¶ 38. To support its position the Insurance Company points to paragraph 48 of the complaint, which alleges that Kline "conceived ideas, concepts and designs for thermostatic mixing valves intended to avoid the Lawler Patents." The Insurance Company also points to paragraph 123, alleging that "Bradley is infringing one or more of the Lawler patents by making, using, selling or offering for sale thermostatic mixing valves which incorporate one or more of the inventions patented by the Lawler Patents."

¶ 39. We again disagree with the Insurance Company's construction of the allegations in the complaint. Paragraph 123 is found in Lawler's amended complaint, count IX, alleging "patent infringement." That Bradley may be guilty of patent infringement for selling mixing valves incorporating one or more patented inventions does not preclude the possibility that Bradley is also guilty of trade dress infringement under count VII for selling those same valves, if those valves also include a misappropriated distinctive, nonfunctional design. Pleading rules permit plaintiffs to plead inconsistent theories for relief.[39] Thus it is not essential that all allegations be construed harmoniously.

¶ 40. Based upon the four corners of the complaint liberally construed and drawing reasonable inferences therefrom, we conclude that the Lawler complaint alleges that Bradley committed an offense covered under the advertising injury provision of the CGL insurance policies.

---

[39] *See* Wis. Stat. § 802.02(5)(b) (2001–02).

28

B

¶ 41. The second question we must answer to determine whether the Insurance Company owes a duty to defend is whether Bradley engaged in advertising.

¶ 42. The CGL insurance policies in question do not define the word "advertising." Wisconsin case law, however, has concluded that the word "advertising" is a non-technical word in an insurance policy that should be given its ordinary meaning.[40] Generally speaking, advertising refers to calling the public's attention to a product or business by proclaiming its qualities or advantages in order to increase sales or arouse a desire to buy or patronize.[41]

¶ 43. In the context of trademark and trade dress infringement cases, courts are divided regarding how broadly to interpret the word "advertising," even understood in this ordinary and popular sense.[42] Courts adopting a narrow definition of advertising require that advertising include the widespread announcement or

[40] *See Atl. Mut. Ins. Co.,* 191 Wis. 2d at 239 (interpreting the word "advertising" as part of the phrase "advertising ideas" in an insurance policy that provided coverage for advertising injuries including the "misappropriation of advertising ideas or style of doing business").

[41] *See id.* (quoting *Cuna Mut. Ins. Soc'y v. DOR,* 120 Wis. 2d 445, 450, 355 N.W.2d 541 (Ct. App. 1984) (quoting *The American Heritage Dictionary of the English Language* (New College ed. 1980) and *Webster's Third New International Dictionary* (4th ed. 1976))).

[42] *See, e.g.,* Graff, *supra* note 3, at 963–64.

distribution of promotional materials.[43] Courts adopting a broader definition of advertising, however, hold that "any oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business" is sufficient.[44] In many cases, the specific context, including the product and the business, will dictate a particular interpretation.[45]

¶ 44. The Lawler complaint does not require that we parse the word "advertising" in the present case and adopt either the narrow or broad interpretation to decide this case. The alleged activities in the present case satisfy both definitions. The complaint expressly alleges that Bradley has created "materials promoting" its thermostatic mixing valves. Lawler even attached one of Bradley's brochures to the original complaint.[46] Moreover, the complaint alleges that Bradley displayed its shower systems, including the thermostatic mixing valves, to "existing and potential customers" at a trade show. The complaint reads:

> 55. Bradley's thermostatic mixing valve [sic] have been and are presently being made and sold under the

[43] *Id.* at 964 (citing, among others, *Farmington Cas. Co. v. Cyberlogic Techs., Inc.,* 996 F.Supp. 695, 700 (E.D. Mich. 1998); *Playboy Enters., Inc. v. St. Paul Fire & Marine Ins. Co.,* 769 F.2d 425, 428–29 (7th Cir. 1985)).

[44] *Id.* (quoting *Farmington Cas. Co. v. Cyberlogic Techs., Inc.,* 996 F.Supp. 695, 700 (E.D. Mich. 1998)).

[45] *See, e.g., Charter Oak Fire Ins. Co. v. Hedeen & Cos., C.V.,* 280 F.3d 730, 737 (7th Cir. 2002) (finding advertising where insured sent business letters because insured was involved in a business with a very limited commercial audience).

[46] Paragraphs 55 and 63 of the complaint are incorporated by reference in count VII. This brochure is not part of the appellate record before us.

product Model Nos. S19–2000, S19–2100 and S19–2200 (hereinafter referred to as the "accused products"). Attached as Exhibit D are copies of selected Bradley materials promoting, as well as installation and maintenance instructions, for these accused products.

. . . .

63. During the week of October 26, 1998, at a show of the American Society of Plumbing Engineers (ASPE) held in Indianapolis, Indiana, Bradley and its representatives displayed emergency shower systems incorporating the accused products to existing and potential customers.

¶ 45. Creating brochures and displaying products at a trade show clearly involve the widespread announcement or distribution of promotional materials and calling the attention of the public to the emergency shower systems by proclaiming their qualities in order to increase sales or arouse a desire to buy. The complaint alleges that the brochures are used to promote the products; it also alleges that the trade show display was directed to customers.[47]

C

¶ 46. Having determined that count VII alleges an offense covered under the advertising injury provisions of the CGL insurance policies and that Bradley engaged in advertising, we now turn to the most difficult question presented in this case: whether the Lawler complaint alleges that Bradley's advertising

[47] *Bear Wolf, Inc. v. Hartford Ins. Co. of the Southeast,* 819 So.2d 818 (Fla. Ct. App. 2002) (display at trade show is advertising).

activities caused the advertising injury. We conclude that a causal connection is alleged, and that the Lawler complaint therefore triggers the Insurance Company's duty to defend.

¶ 47. The CGL insurance policies provide coverage for damages resulting from an enumerated offense that causes injury committed in the course of advertising goods, products, or services.[48] This "causal connection" requirement is standard in advertising injury provisions of CGL insurance policies, though its treatment by courts is anything but uniform. As the Third Circuit has explained, "there is much confusion in the case law concerning when an 'advertising injury' is 'caused' by advertising within the meaning of standard business insurance policies."[49]

¶ 48. The dispute between the parties in the case at hand includes a dispute over which line of cases to follow. Some courts interpreting the causal connection requirement in trademark and trade dress infringement cases hold that the cause of an alleged trademark or trade dress advertising injury is the initial copying of the trademark or trade dress, not the subsequent advertising that depicts the copied trademarks or trade dress.[50] The Insurance Company asserts that the court of appeals correctly concluded that the alleged injury Lawler suffered was the theft of its trade secrets, and

---

[48] The policy reads: "This insurance applies to . . . [a]dvertising injury caused by an offense committed in the course of advertising your goods, products or services."

[49] *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.,* 193 F.3d 742, 750 n.8 (3d Cir. 1999). *See also* Graff, *supra* note 3, at 966–73; Romine, *supra* note 23, at 234–37.

[50] *See R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.,* 287 F.3d 242, 247, 248 (2d Cir. 2002) (citing *Advance Watch Co. v. Kemper Nat'l Ins. Co.,* 99 F.3d 795, 806–07 (6th Cir. 1996)).

nothing about Bradley's brochures or participation in a trade show caused that theft or led to the misappropriation of those trade secrets.

¶ 49. Other courts conclude more broadly that the causal connection requirement is satisfied when a defendant advertises the products with confusingly similar trademarks or trade dress, because the resulting consumer confusion is part of the injury caused by trademark or trade dress infringement.[51] Bradley argues that the theft of trade secrets is but one alleged injury in the Lawler complaint and that the court of appeals improperly construed the complaint when it concluded that the only injury suffered by Lawler was the theft of its trade secrets. Properly construed, argues Bradley, Lawler's complaint also alleges harm due to consumer confusion over the origin of the thermostatic mixing valve.

¶ 50. We agree with Bradley that the Insurance Company and the court of appeals have construed the complaint—and Lawler's injuries—too narrowly. Count VII of the Lawler complaint alleges that the misappropriation of Lawler's designs "wrongfully and falsely designates the origin of Lawler's thermostatic mixing valve technology as originating from or being connected with Bradley, and amounts to utilizing a false description or representation in commerce."

---

[51] *See R.C. Bigelow,* 287 F.3d at 247–48 (citing *Energex Sys. Corp. v. Fireman's Fund Ins. Co.,* 1997 WL 358007, at *4 (S.D.N.Y. June 25, 1997); *J.A. Brundage Plumbing & Roto-Rooter, Inc. v. Mass. Bay Ins. Co.,* 818 F. Supp. 553, 558 (W.D.N.Y. 1993) (*vacated due to settlement,* 153 F.R.D. 36 (W.D.N.Y. 1994)); *Allou Health & Beauty Care, Inc. v. Aetna Cas. & Sur. Co.,* 703 N.Y.S.2d 253, 255–56 (2000). For a discussion of the cases, see Lauzon, *supra* note 23, § 19.

¶ 51. The allegations in the Lawler complaint state claims for injuries above and beyond the initial misappropriation of trade secrets and designs. Even if the main thrust of the complaint is recovery for trade secret theft, the four corners of the complaint include more. Count VII of the complaint alleges that Lawler was injured by the consumer confusion caused by the thermostatic mixing valves that Bradley produced with misappropriated designs. It is a reasonable inference, in the present case, that the promotional materials and trade show display caused at least some of that injury.

¶ 52. The Second Circuit Court of Appeals recently addressed a similar issue in *R.C. Bigelow, Inc. v. Liberty Mutual Insurance Company,* 287 F.3d 242 (2d Cir. 2002). The *Bigelow* court held that allegations of trade dress infringement in a third-party complaint satisfied the causal nexus requirement of the insurance policy when one of the alleged injuries was consumer confusion and advertisements of the alleged product were attached. The *Bigelow* court explained that trademark and trade dress infringement is a "continuing" tort that gives rise to a claim for relief as long as "the infringement persists."[52] Thus, it rejected the view that trade dress infringement injuries were caused only at the moment of copying and not by subsequent advertising. The Second Circuit explained:

> The causation issue is not whether the advertisement can be the cause of the creation of the infringing product; the issue, under the terms of the policy, is

[52] *R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.,* 287 F.3d 242, 248 (2d Cir. 2002) (citing *Menendez v. Holt,* 128 U.S. 514, 523 (1888); *Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 526 (10th Cir. 1987) (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 572 F.2d 574, 578 (7th Cir. 1978))).

whether there has been "advertising injury" that was "caused by an offense committed in the course of advertising" the insured products. In this case, the alleged "offense" is creating consumer confusion by the use of copied trade dress. As the Third Circuit observed in *Frog, Switch,* where an advertising injury is alleged, the relevant causation issue with regard to insurance coverage is not whether "the injury *could have* taken place without the advertising," but "whether the advertising did in fact *contribute materially* to the injury." [The insured's] ads displayed the allegedly infringing trade dress. If, as [was] alleged, [the insured's] copied trade dress created consumer confusion, the ads could be found to have contributed to such confusion.[53]

¶ 53. We agree with the reasoning of the Second Circuit. Our inquiry is whether, based on the allegations in the complaint, Bradley's advertising of products contributed to the alleged injury of consumer confusion suffered by Lawler.[54] We conclude that it is reasonable to infer, based upon the allegations that Bradley created materials promoting the misappropriated designs and displayed those designs at a trade show, that these advertising activities contributed to the alleged injuries. Thus, we conclude that the causal connection requirement was met in this case.

[53] *R.C. Bigelow, Inc.,* 287 F.3d at 248 (quoting *Frog, Switch,* 193 F.3d at 750 n.8 (second emphasis added)).

[54] We do not address in the present case whether a claim for trademark or trade dress infringement under the Lanham Act will always satisfy the causal nexus requirements, as Bradley asserts. *See, e.g., Poof Toy Prods., Inc. v. United States Fid. and Guar. Co.,* 891 F.Supp. 1228 (E.D. Mich. 1995) (allegations of trademark and trade dress infringement inherently involve advertising activity because in order to cause consumer confusion one must advertise the mark or dress).

¶ 54. For the reasons set forth, the Lawler complaint states an offense covered under the CGL insurance policies, the complaint alleges that Bradley engaged in advertising, and the complaint alleges a causal connection between the injury alleged and Bradley's advertising. We therefore hold that the Insurance Company had a duty to defend Bradley in the lawsuit brought by Lawler against Bradley.

## V

¶ 55. The next issue we must decide is whether the Insurance Company's duty to defend was abrogated by Bradley's failure to notify the Insurance Company of the Lawler lawsuit until almost fifteen months after the lawsuit was first brought.

¶ 56. The CGL insurance policies required that Bradley "promptly notify" Fireman's Fund in the event of a lawsuit. The insurance policies read, in relevant part:

Section IV – Commercial General Liability Conditions, 2.

. . . .

a. In the event of an occurrence, offense, claim or suit, you must promptly notify us. Your duty to promptly notify us is effective when your executive, officers, partners, members, or legal representatives are aware of the General Liability occurrence, offense, claim, or

suit. Knowledge of an occurrence, offense, claim or suit by other employee(s) does not imply you also have such knowledge.[55]

¶ 57. Lawler first filed its complaint on December 3, 1998. On December 14, 1998, the defendants filed their appearances in the case. The Insurance Company, however, did not receive notice until March 2, 2000, when AON Risk Service, on behalf of Bradley, forwarded loss notices to the Insurance Company.

¶ 58. According to the Insurance Company, because Bradley waited nearly fifteen months to provide it with notice of the suit, the Insurance Company need not defend the suit or indemnify Bradley. Bradley does not dispute that its notice was neither prompt nor timely. Rather, Bradley argues that an insurer is liable even when notice is untimely if the insurer is not prejudiced by the failure to provide prompt notice. In this case, according to Bradley, the Insurance Company

---

[55] This language applies to the CGL policies in effect February 1, 1998, through February 1, 2000. It was added as part of the broadened endorsement, modifying the original language below:

Section IV – Commercial General Liability Conditions

2. Duties in the event of occurrence, offense, claim or suit:

. . . .

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

was not prejudiced by the nearly fifteen-month delay in receiving notice of the Lawler lawsuit.

¶ 59. Prejudice is presumed under Wisconsin law if notice of a suit is given more than one year after the time required in an insurance policy.[56] The burden is on the insured to prove that no prejudice resulted to the insurer.[57] Whether there was prejudice is typically a question of fact.[58] However, summary judgment may be granted on the issue of prejudice because of an insured's untimely notice when no genuine issue as to material fact exists and one party is entitled to judgment as a matter of law.

¶ 60. The Insurance Company and Bradley dispute whether the Insurance Company was prejudiced by the untimely notice. Yet their dispute goes only to the conclusion of law to be drawn from undisputed facts; no dispute exists over material facts.

¶ 61. An insurer is prejudiced by late notice when, for example, it cannot investigate the facts necessary to determine whether coverage should be provided and when it has been denied the opportunity to have input into the manner in which the underlying claim is being defended.[59] The Insurance Company argues that

---

[56] *Gerrard Realty Corp. v. Am. States Ins. Co.,* 89 Wis. 2d 130, 145–47, 277 N.W.2d 863 (1979).

[57] *Neff v. Pierzina,* 2001 WI 95, ¶ 43, 245 Wis. 2d 285; 629 N.W.2d 177; *see also* Wis. Stat. § 632.26(2) (2001–02) (failure to give notice "does not bar liability under the policy if the insurer was not prejudiced by the failure, but the risk of nonpersuasion is upon the person claiming there was no prejudice").

[58] *Neff,* 2001 WI 95, ¶ 47.

[59] *Gerrard Realty,* 89 Wis. 2d at 146–47.

Bradley's late notice was prejudicial because it was given only two weeks to engage in discovery prior to the preliminary injunction hearing scheduled for March 16, 2000. According to the Insurance Company, such late notice denied it the opportunity to participate in the extensive discovery that had taken place up until that point and put it in the untenable position of attempting to hire counsel and digest a year's worth of discovery in just two weeks.

¶ 62. Bradley does not dispute either that the Insurance Company had only two weeks' notice or that having only two weeks' notice made it difficult to prepare for a preliminary injunction hearing of this magnitude. Yet Bradley responds that the untenable position in which the Insurance Company found itself was inconsequential in the present case. Bradley points to the fact that Jon Wittig, the Insurance Company's litigation manager, testified that he would have denied a duty to defend on the exact same complaint even if he had been provided with notice only one month after the Lawler lawsuit was filed, to support its conclusion. Wittig testified as follows:

> Q: [I]f this lawsuit had been filed in December of 2000 and you received notice of the complaint in January of 2001, would you have handled the claim any differently?
>
> A: The same lawsuit, exact same lawsuit?
>
> Q: Correct.
>
> A: No.
>
> Q: You would have denied coverage?
>
> A: Yes.
>
> Q: And would you have done any further investigation?

A: No, because all I'm required to do is compare the complaint to the policy.

Q: Would you have—I take it you would not only have denied coverage, you would have denied the duty to defend; is that correct?

A: Yes.

■■■■

¶ 63. The Insurance Company nowhere disputes this admission or its veracity.[60] The Insurance Company has consistently maintained no coverage existed. Even if the lack of timely notice placed the Insurance Company in a difficult litigation position, the clear and uncontroverted evidence in the record is that the timing of Bradley's notice would not have changed the Insurance Company's decision to deny its duty to defend.[61] Thus we conclude as a matter of law that the Insurance Company suffered no prejudice. Bradley carried its burden to prove lack of prejudice.

## VI

¶ 64. Finally, the Insurance Company disputes the amount the circuit court awarded to Bradley for attorney fees. The Insurance Company asks this court

---

[60] The Insurance Company's only argument concerning Wittig's testimony is that Bradley has not met its burden by relying on it. The Insurance Company argues that it is not enough for Bradley to assert that "at the time of his deposition, Wittig never identified a specific example of prejudice;" such testimony is mere speculation as to actual prejudice. Plaintiff-Appellant's Brief at 53.

[61] *See, e.g., Maryland Cas. Co. v. Wausau Chem. Corp.*, 809 F.Supp. 680, 695 (W.D. Wis. 1992) (finding no prejudice as a matter of law where there was evidence that insurers would not have acted any differently even if insured had given timely notice).

to reverse the award of attorney fees and remand the case for a hearing to determine reasonable attorney fees. The dispute does not involve whether the Insurance Company owes Bradley attorney fees but merely addresses the amount of those fees.

¶ 65. The circuit court awarded Bradley attorney fees in the amount of $1,383,704.50 for defense of the Lawler lawsuit from the time that Bradley tendered defense to the Insurance Company. Bradley submitted a proposed order identifying this amount as the total for attorney fees. The proposed order was supported in large part by an affidavit submitted by the Bradley's Senior Vice President of Finance, Secretary and Treasurer and it included a monthly breakdown of the total amount due on legal bills related to the Lawler lawsuit; these total amounts were sub-divided into three categories of expenses—patent application, non-infringement of patent, and lawsuit.[62]

¶ 66. The Insurance Company objected to the proposed order and requested a hearing to determine whether the attorney's fees claimed by Bradley were in fact reasonable. The Insurance Company pointed out that the supporting material did not sufficiently detail

---

[62] Bradley also submitted (1) an affidavit from the attorney primarily responsible for handling its coverage dispute case with the Insurance Company generally describing the type of legal work completed, and (2) an affidavit from a paralegal at its attorney's office, who is also a Certified Public Accountant, explaining his calculations of interest due on the owed amounts.

In addition, Bradley's Motion in Opposition to the Insurance Company's Motion for Summary Judgment included a general description of services provided in defending against the Lawler complaint. No reference is made to any of these additional documents in the calculation of attorney fees for defense of the Lawler complaint in the circuit court's order of judgment.

the number of hours worked, the type of work being done, or the person completing the work; the Insurance Company also pointed out discrepancies in the amounts identified for particular months. The circuit court did not grant the Insurance Company's request for a hearing and approved Bradley's proposed order for payment of attorney fees.

¶ 67. The general rule is that a circuit court's findings of fact will not be disturbed on appeal unless clearly erroneous. An exception to this rule exists with respect to determinations of the value of legal services,[63] because the value of legal services is reviewed on appeal by judges who have expert knowledge as to the reasonable value of legal services.[64] The proper factors to consider when determining reasonable attorney fees include: "the amount and character of the services rendered; the labor, time, and trouble involved; the character and importance of the litigation; the amount of money or value of the property affected; the professional skill and experience called for; the standing of the attorney in his profession; and the general ability of the client to pay and the pecuniary benefit derived from the services."[65]

¶ 68. The Insurance Company argues that the affidavit did not provide sufficiently detailed information concerning who performed legal services, at what rate, for what amount of time, and what services were provided, for the circuit court to make a determination

---

[63] *Touchett v. E.Z. Paintr Corp.*, 14 Wis. 2d 479, 488, 111 N.W.2d 419 (1961).

[64] *Id.*

[65] *Three & One Co. v. Geilfuss*, 178 Wis. 2d 400, 415, 504 N.W.2d 393 (Ct. App. 1993) (citing *Touchett*, 14 Wis. 2d at 488)).

of reasonableness. The court of appeals did not reach this issue, and Bradley did not address this issue in its brief or at oral argument before this court.[66]

¶ 69. We agree with the Insurance Company that the information provided by Bradley was not sufficient to enable the circuit court or this court to determine a reasonable figure for attorney fees in this case. A list of monthly totals paid for legal services broadly grouped across areas of representation does not give either court enough information to employ the analysis required by Wisconsin law. As the Insurance Company argues, it is not possible to know from the affidavits the character of the work performed, how much time was spent on each type of work, and who performed the work. Without this information, a court cannot determine whether the amount that Bradley paid per month was in fact reasonable.

¶ 70. Consequently, we reverse the circuit court's award of attorney fees in the amount of $1,383,704.50 and remand the award of attorney fees to the circuit court for additional evidence and the determination of reasonable attorney fees.

---

[66] In the court of appeals, Bradley argued that the circuit court properly entered judgment in its favor in the amount of $2,887,594.24. Regarding the amount of the attorney fees, Bradley asserted that the Insurance Company was made aware that the cost of defense work was approaching $1 million when it filed its reply to the Insurance Company's summary judgment motion and detailed some of the work done in defense of Bradley in an affidavit from Bradley's attorney. Bradley also argued that the Insurance Company waived any right to contest the amount by failing to request additional information until after summary judgment was awarded to the defendants.

## VII

¶ 71. For the foregoing reasons, we reverse the decision of the court of appeals and remand the issue of the reasonableness of the attorney fees to the circuit court.

*By the Court.*—The decision of the court of appeals is reversed and the issue of the reasonableness of the attorney fees is remanded.